**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

_____

S.B., on behalf of herself and all
others similarly situated,

   Plaintiff,

v.

TENET HEALTHCARE CORPORATION,

   Defendant.
_____)

)
)
)
)
)
)
)
)
)
)
)
)

Case No. 1:17-cv-00075-RWS

**JURY TRIAL DEMANDED**

**FIRST AMENDED CLASS ACTION COMPLAINT**

   Plaintiff S.B., individually, and on behalf of all others similarly situated, by and through counsel, pursuant to Federal Rule of Civil Procedure 15(a)(1)(B), files this First Amended Class Action Complaint against Tenet Healthcare Corporation. Plaintiff's allegations herein are based upon personal knowledge and belief as to her own acts and upon the investigation of her counsel and information and belief as to all other matters:

**PARTIES**

   1. Plaintiff S.B. is a citizen of the State of Georgia.

   2. Defendant Tenet Healthcare Corporation ("Tenet") is incorporated in Nevada with its principal executive offices located at 1445 Ross Avenue, Suite

1400, Dallas, Texas 75202.  Tenet's common stock trades on the NYSE under the ticker symbol "THC."  Tenet has been served with process by service on its registered agent, CT Corporation System at 1201 Peachtree Street, NE, Suite 1240, Atlanta, GA 30361.

## JURISDICTION AND VENUE

3.     This case was originally filed by Plaintiff in the Superior Court of Fulton County, Georgia.  Despite Plaintiff's preference for state court, she does not dispute that this Court also has proper jurisdiction.  Jurisdiction is proper in this Court pursuant to 28 U.S.C. § 1332(d)(2) because there are more than 100 potential members of the proposed class, the aggregate amount in controversy exceeds $5,000,000 exclusive of interest, fees, and costs, and at least one member of the proposed class member is a citizen of a state other than Georgia.

4.     This Court has personal jurisdiction over Defendant because it conducts, and has conducted for many years, substantial business within the State of Georgia.  As such, it has significant, continuous, and pervasive contacts in Georgia.

5.     Venue lies within this judicial district under 28 U.S.C. § 1391 because Defendant conducts, and did at all relevant times conduct, substantial business in

this district, and a substantial portion of the events, omissions, and acts giving rise to the claims herein occurred in this district.

## COMMON FACTUAL ALLEGATIONS

6.     Since as early as 2000, Tenet, through its subsidiaries like Atlanta Medical Center and North Fulton Medical Center, entered into written contracts with Hispanic Medical Management, Inc. d/b/a Clinica De La Mama ("Clinica") and other affiliated Clinica entities whereby Clinica purportedly provided translation, management, consulting, marketing, and other services to Tenet.

7.     The true aim of these contracts between Tenet and Clinica, however, was the recruitment and referral of primarily undocumented immigrant women who would be eligible for emergency Medicaid services when they gave birth.

8.     By knowingly entering these contracts with the purpose of receiving patient referrals, Tenet violated federal and state law and submitted false certifications to various state Medicaid programs.  Such certifications erroneously stated that Tenet was in compliance with such federal and state laws, including the so-called Anti-Kickback Statute, 42 U.S.C. § 1320(a)-7b.

9.     Tenet's claims to the state Medicaid programs for patients illegally recruited and referred from Clinica resulted in the payment of tens of thousands of ineligible Medicaid claims over the course of more than a decade.

10.     Tenet and several of its entities recently entered into a settlement valued in excess of $513 million to resolve a long-running criminal investigation and civil litigation about the kickback scandal involving Clinica and several of Tenet's hospitals.

11.     As part of the settlement, Atlanta Medical Center and North Fulton Medical Center pled guilty to conspiracy to violate the federal Anti-Kickback Statute and to defraud the United States.

12.     The global resolution of the criminal investigation and civil litigation also includes criminal forfeiture of over $145 million, and an overall civil settlement with the United States, Georgia, and South Carolina for more than $368 million.

13.     However, Tenet's settlement with the United States, Georgia, and South Carolina failed to compensate the patients of Clinica and Tenet who were unknowing participants in the illegal kickback scheme perpetrated by Tenet.

14.     Tenet's scheme resulted in Clinica patients – who were primarily undocumented Hispanic women – being forced to go to Tenet hospitals for labor and delivery services that were readily available at other hospital facilities.  These victims often incurred unnecessary charges and expenses as a result.  This case

seeks reimbursement for all such charges and expenses as well as other damages and fees to the fullest extent allowed by law.

### A.   The Medicare and Medicaid Programs.

15.   Congress enacted Title XVIII of the Social Security Act, known as the Medicare program, in 1965 to pay for the costs of certain healthcare services. Entitlement to Medicare is based on age, disability, or affliction with end-stage renal disease.  42 U.S.C. §§ 426, 426A.

16.   The Department of Health and Human Services ("HHS") is responsible for the administration and supervision of the Medicare program.  The Centers for Medicare and Medicaid Services ("CMS") was created as the agency of HHS directly responsible for the administration of the Medicare program.

17.   Part A of the Medicare Program authorized payment for institutional care, including hospital care.  *See* 42 U.S.C. §§ 1395c-1395i-4.  In addition, hospitals that treat large numbers of low-income patients, including Medicaid patients, were able to seek additional federal funds through the Medicare Disproportionate Share ("DSH") program, 42 C.F.R. § 412.106.

18.   The formula for determining such funding took into account the number of patients treated by a given hospital who were eligible for Medicaid at

the time of their treatment. 42 U.S.C. § 1395ww(d)(5)(F)(vi); 42 C.F.R. § 412.106(b)(4)(i).

19.    The Medicaid Program was likewise created in 1965 as part of the Social Security Act, which authorized federal grants to states for medical assistance to low-income, blind or disabled persons, or to members of families with dependent children or qualified pregnant women or children.

20.    The Medicaid Program is a jointly funded federal-state program and is administered by CMS at the federal level.

21.    Medicaid providers submit claims for payment to states which pay the claims and obtain the federal portion of the payment from accounts which draw on the United States Treasury.   After the end of each calendar quarter, the state submits to CMS a final expenditure report, which provides the basis for adjustment to the quarterly federal funding amount (to reconcile the estimated expenditures to actual expenditures).  42 C.F.R. §§ 430.0-430.30.

22.    Undocumented aliens are not eligible for regular Medicaid coverage, but are eligible for certain types of Emergency Medical Assistance, pursuant to 42 U.S.C. § 1396b(v).  Emergency Medical Assistance ("EMA") is the part of the Medicaid program that provided coverage for emergency medical conditions, including childbirth for undocumented aliens.

23.    Emergency labor and delivery by undocumented, otherwise eligible aliens, is considered an emergency medical condition under Medicaid pursuant to 42 U.S.C. § 1396b(v)(2) and § 1396b(v)(3).  Children born to women approved for EMA for their delivery were eligible for what is known as Newborn Medicaid. Individuals who receive any type of benefit under Medicaid are referred to as Medicaid "beneficiaries."

24.    As Georgia Medicaid providers, hospitals were and are required to execute "Statements of Participation," commonly referred to as provider agreements.   The provider agreements entered into by hospitals mandate compliance with the Georgia Medicaid rules that prohibit paying or accepting, directly or indirectly, kickbacks for referrals.

25.    The provider agreements also stated at all relevant times that "Payment shall be made in conformity with the provisions of the Medicaid program, applicable state and federal laws, rules and regulations promulgated by the U.S. Department of Health and Human Services and the State of Georgia and the Department's policies and procedures manuals in effect on the date the service was rendered."

26.    The Georgia Department of Community Health prohibited at all relevant times hospital providers from paying kickbacks for referrals of Medicaid

7

patients, and authorized the denial of reimbursement for non-compliance with any of its applicable policies and procedures and recoupment of reimbursement when a provider failed to comply with all terms and conditions of participation related to the services for which a claim was paid.

27.    In Georgia, provider hospitals participating in the Medicaid program submit claims for hospital services rendered to Medicaid beneficiaries to the Georgia Department of Community Health for payment, either directly or through a state designee such as a fiscal intermediary.

28.    As South Carolina Medicaid providers, hospitals were required at all relevant times to execute a contract with the South Carolina Department of Health and Human Services, commonly referred to as a provider agreement.

29.    The provider agreements entered into by hospitals mandated compliance with all state and federal regulations, including those rules that prohibit paying or accepting, directly or indirectly, kickbacks for referrals.

30.    The provider agreements also stated, in pertinent part: "The Provider shall certify that the statements, reports, and claims, financial or otherwise, are true, accurate and complete, and the Provider shall not submit for payment, any claims statements or reports which he knows, or has reason to know, are not

properly prepared or payable pursuant to federal and state law, applicable regulations, this Contract and SCDHHS policy."

31.    In South Carolina, provider hospitals participating in the Medicaid program submitted claims for hospital services rendered to Medicaid beneficiaries to the South Carolina Department of Health and Human Services.

32.    The South Carolina Medicaid program would not pay claims submitted by a provider hospital for services that it knew were the result of a provider hospital's payments to any person for the referral of Medicaid beneficiaries.

###    B.    Tenet, its Affiliated Hospitals, and Clinica.

33.    Tenet directly or indirectly owns, or owned at the relevant time, for-profit hospitals across the United States, including Atlanta Medical Center, Inc. ("Atlanta Medical"), North Fulton Hospital, Inc. d/b/a North Fulton Hospital ("North Fulton"), Tenet Health System Spalding, Inc. d/b/a Spalding Regional Medical Center ("Spalding"), and Hilton Head Health System, L.P. d/b/a Hilton Head Hospital ("Hilton Head").

34.    In December 2015, it was announced that WellStar Health System was acquiring Atlanta Medical, North Fulton, and Spalding from Tenet as part of a five-hospital acquisition valued at $661 million, but that Tenet was retaining all

liabilities regarding this matter.  The sale did not include Hilton Head which still appears to be owned by Tenet.

35.    Atlanta Medical operates a for-profit hospital located in Atlanta, Georgia.  Atlanta Medical competed with other hospitals in Fulton County for patients, including expectant mothers.

36.    North Fulton operates a for-profit hospital that was located in Roswell, Georgia. North Fulton competed with other hospitals in Fulton County for patients, including expectant mothers.

37.    Spalding operates a for-profit hospital that was located in Griffin, Georgia. Spalding competed with other hospitals in that area for patients, including expectant mothers.

38.    Hilton Head owned a for-profit hospital that was located in Hilton Head, South Carolina.  Hilton Head competed with other hospitals in the area for patients, including expectant mothers.

39.    From at least March 2000 to at least 2013, Atlanta Medical, North Fulton, and Spalding were enrolled as providers in the Georgia Medicaid program and billed and received payment from the Georgia Medicaid program for labor and delivery and newborn services.

40.     From at least March 2000 to at least 2012, Atlanta Medical was enrolled as a Medicare provider, and submitted cost reports on a yearly basis to the Medicare program and sought and received additional reimbursement from the Medicare Disproportionate Share (DSH) program.

41.     From at least 2001 to at least 2013, North Fulton was enrolled as a Medicare provider, and submitted cost reports on a yearly basis to the Medicare program and sought and received additional reimbursement from the Medicare DSH program.

42.     From at least January 2006 to January 2012, Hilton Head was enrolled as a provider in the South Carolina Medicaid program and billed and received payment from the South Carolina Medicaid program for labor and delivery services.

43.     Tenet hospitals like Atlanta Medical, North Fulton, and others had Patient Financial Services ("PFS") departments the purpose of which was to assist all uninsured or indigent patients who had received hospital services to qualify for federal health care program benefits, including Medicaid and EMA, to pay for their services.

11

44.    On or around 2008, Tenet began to utilize a new wholly-owned subsidiary, Conifer Health Solutions, to perform many of the same functions previously performed by PFS in its hospitals.

45.    In summer 2006, Tenet entered into a civil settlement agreement with the United States to resolve its False Claims Act liability arising from government investigations involving alleged fraudulent billing practices and Anti-Kickback Statute violations.  As part of the civil settlement agreement, Tenet entered into a Corporate Integrity Agreement ("CIA") with the Department of Health and Human Services' Office of Inspector General in September 2006 to ensure that all Tenet facilities complied with Medicare and Medicaid Program requirements, including compliance with the Anti-Kickback Statute.  The Department of Health and Human Services agreed not to exclude Tenet from participating in the Medicare and Medicaid programs, conditioned on its compliance with the obligations in the CIA for five years.

46.    The CIA required, among other things, Tenet to strengthen its policies, procedures, and controls for contracts with referral sources to ensure compliance with the Anti-Kickback Statute.  The CIA also required certain employees who reviewed or approved contracts with referral sources, including the

hospital CEOs and CFOs, to attend specialized training on referral source contracts during each year of the CIA.

47.     The CIA further required that Tenet submit certifications from "Senior Corporate Management," which included the Tenet Regional Senior Vice Presidents, to the Department of Health and Human Services as part of Tenet's CIA annual reports for each year of the 5-year CIA, certifying "[t]o the best of my knowledge, except as otherwise described in the applicable report, Tenet is in compliance with the requirements of the Federal health care program requirements and the obligations of this CIA."

48.     From at least 1999 to in or around September 2010, Clinica held itself out as operating several medical clinics that provided prenatal care to predominantly undocumented Hispanic women in Georgia and South Carolina.

49.     For a fee, generally between $1,200 to $1,700 cash and typically in excess of $1,500, Clinica offered to provide prenatal medical care and ancillary services to pregnant Hispanic women.  Women who signed up with Clinica for prenatal care were assigned to a doctor designated by Clinica.

50.     The majority of undocumented Hispanic women who became Clinica patients were uninsured and indigent.  Under state and federal law, including the

Emergency Treatment and Labor Act, hospitals are required to provide medical care to any pregnant woman about to deliver a baby.

51.    When an uninsured and indigent Clinica patient delivered her baby at a hospital and was qualified for EMA under Medicaid, the hospital became eligible to receive an EMA Medicaid payment for the hospital services rendered to that patient and a Newborn Medicaid payment for the hospital services rendered to her baby.

52.    From at least 2000 through at least 2013, in Fulton County and elsewhere, and as described further below, Clinica's owners and operators and certain executives at Tenet's hospitals, acting as agents of the hospitals, at least in part for the benefit of the Tenet, and within the course and scope of their employment and authority at Tenet, agreed that Tenet hospitals would pay the owners and operators of Clinica for referring its Medicaid patients to Tenet hospitals for delivery and arranging for services to be provided to Clinica patients and their newborns at Tenet hospitals.

53.    The purpose of this conspiracy was for Clinica's owners and operators and others to unlawfully enrich themselves, and for Tenet to unlawfully enrich and benefit itself, by paying, and causing to be paid, and receiving illegal remuneration designed to induce Clinica's owners and operators to refer Clinica

patients *only* to Tenet hospitals and arrange for services to be provided to Clinica patients and their newborns at Tenet hospitals, for the sole purpose of such Tenet hospitals billing and obtaining money from the Medicaid and Medicare DSH Programs for services provided to the unlawfully referred Clinica patients and their newborns. This conspiracy was conducted with total disregard for the individual safety, welfare, and care of the women who were referred to Tenet hospitals. Further, the conspirators showed no regard for the increased costs and inconvenience to their victims, who were instructed to utilize Tenet hospitals that were farther from their residences, more expensive, and less appropriate for their medical needs.

54.   Certain executives at Tenet hospitals and others understood that: (1) the owners and operators of Clinica were very successful at attracting pregnant, undocumented Hispanic women to its clinics for prenatal care and were able to control where these women delivered their babies; and (2) Tenet hospitals could potentially realize a significant revenue stream from Medicaid and Medicare DSH payments for providing labor and delivery services to the Clinica patients and for providing services to their newborn babies.

55.   As a result, Clinica and Tenet created and caused to be created contracts between Tenet hospitals and Clinica.

56.     Under these contracts, Tenet hospitals purported to pay Clinica to provide various services to Tenet hospitals including management services, marketing consulting services, translation services, translation management services, Medicaid eligibility determination paperwork, community outreach, educational classes, and birth certificate services.

57.     The true purpose of the relationship, however, was to induce the owners and operators of Clinica to refer the Clinica patients to Tenet hospitals and arrange for services to be provided to the Clinica patients and their newborns at the relevant Tenet hospital.

58.     The alleged services that were purported to be provided by Clinica pursuant to these contracts were, in some instances, either: (1) not needed; (2) duplicative of services already being provided; (3) substandard; or (4) not rendered at all.

59.     The contracts were a pretextual mechanism that allowed Tenet to cause the payment of over $12 million to the owners and operators of Clinica in exchange for referring the Clinica patients to Tenet hospitals and arranging for services to be provided to the Clinica patients and their newborns at Tenet hospitals.

60.     The owners and operators of Clinica were able to steer Clinica patients to particular hospitals, and arrange for Clinica patients and their newborns to receive services at Tenet hospitals, based on their control of the patients who sought services from them and their leverage over the physicians who saw those patients in their clinics.

61.     Although Clinica did not employ the physicians or other service providers, the owners and operators of Clinica controlled which physicians would be given time slots to see patients at the clinics, and could ensure that only physicians who agreed to deliver at Tenet hospitals were given slots.

62.     To further ensure that Clinica patients delivered at Tenet hospitals, the owners and operators of Clinica allowed only physicians who had delivery privileges at Tenet hospitals to work in the clinics during particular times.

63.     Depending on what day a patient arrived for her initial visit, among other factors, the patient was assigned to a particular doctor and told where she would deliver her child. Clinica personnel would provide the patient with a Clinica identification (ID) card, which would be presented to the hospital where the patient delivered her baby.

64.     The ID card listed both the physician to whom the patient had been assigned and the hospital where the patient was told to deliver her baby.

17

65.     To ensure that patients delivered at Tenet hospitals, and as part of the scheme, Clinica and Tenet made and caused to be made false statements and representations to Clinica patients.

66.     For example, expectant mothers were told that Medicaid would cover the costs associated with their childbirth and the care of their newborn baby only if the expectant mother delivered at one of Tenet's hospitals.

67.     In other instances, expectant mothers simply were told that they were required to deliver their baby at one of Tenet's hospitals, leaving expectant mothers with the false and mistaken belief that they could not select the hospital of their choice.

68.     This scheme was constructed and carried out by Tenet and it utilized Clinica as its agent in furthering the fraudulent conduct.  But for Tenet's promise of illegal kickbacks, and its explicit instructions that staff at Clinica make affirmative misrepresentations to those in its care that were devised and disseminated by Tenet to Clinica, Clinica would not have participated in the fraudulent conduct alleged herein.

69.     If Clinica did not follow Tenet's instructions to falsely represent that Clinica's patients must deliver their baby at Tenet's hospitals, Tenet would not issue illegal kickbacks to Clinica.

18

70.     Tenet admitted to Clinica acting as its agent in furtherance of the fraudulent scheme alleged herein when it entered into the $513 million settlement with the United States, Georgia, and South Carolina.   As the Non-Prosecution Agreement states: the true purpose of the relationship between Tenet and Clinica was for **Tenet** "to induce the owners and operators of Clinica to refer the Clinica patients to the Tenet hospitals . . . ."  *See* Non-Prosecution Agreement, ¶ 41.[1]

71.     As a result of these false and misleading statements and representations, along with others, many expectant mothers traveled long distances from their homes to deliver at Tenet hospitals, placing their health and safety, and that of their newborn babies, at risk.  Moreover, Tenet's victims and their families were forced to pay the many attendant costs of such improper care as described herein.

72.     As a result of this arrangement, Tenet hospitals received more than $125 million in Georgia and South Carolina Medicaid funds and more than $20 million in Medicare DSH funds for services provided to Clinica patients and their newborns at Tenet hospitals.  Of that amount, Atlanta Medical received over $74 million in Georgia Medicaid funds and over $10 million in Medicare DSH funds, North Fulton received over $48 million in Georgia Medicaid funds and over $12

_____

[1] https://www.justice.gov/opa/file/899961/download (last visited Jan. 24, 2017).

million in Medicare DSH funds, Hilton Head received over $4 million in South Carolina Medicaid Funds, and Spalding received approximately $10,000 in Georgia Medicaid funds.

### C.    Plaintiff's Experiences with Tenet and Clinica.

73.    In 2006, Plaintiff resided less than five miles away from Clinica and received her prenatal care there.  The staff at Clinica recommended Plaintiff enroll in an emergency Medicaid program because Plaintiff was uninsured at that time. With the assistance of the staff at Clinica, Plaintiff enrolled in the program.

74.    The staff also informed Plaintiff that she would only be able to give birth at Atlanta Medical Center or North Fulton Medical Center under the terms of the program and that, if she went elsewhere, she would not be covered.  Plaintiff also received a Clinica identification card that listed the physician assigned to Plaintiff and that Plaintiff was required to give birth at Atlanta Medical Center.

75.    Plaintiff presented her Clinica card to Atlanta Medical Center and gave birth there.  Plaintiff strongly preferred to give birth at a hospital closer to her home but was unable to do so since she had been told it would not be covered.  In addition to the inconvenience to her and family and friends of traveling many miles further for her birth, Plaintiff suffered a variety of higher costs as a result of

Tenet's assigning her to Atlanta Medical Center.  Plaintiff also paid money, such as co-pays, to Tenet and was later sent further invoices and bills from Tenet.

76.    Plaintiff was told by the staff at Clinica that, if she received bills from Tenet, that she was required to take the bills to Clinica for them to handle.  This is what Plaintiff did.

77.    During 2006, Tenet, through Atlanta Medical Center, paid approximately $579,498 to Clinica for the benefit of Atlanta Medical Center so owners and operators of Clinica would continue to direct Clinica patients to deliver at Atlanta Medical Center.  *See* Non-Prosecution Agreement, ¶ 83.  At no time did Tenet or any of its employees or agents inform her that she was not required to give birth at Atlanta Medical Center as her Clinica identification card stated, despite Tenet's knowledge that Plaintiff had been falsely informed she was required to deliver at Atlanta Medical Center.

78.    In 2009, Plaintiff became pregnant with twins and retuned to Clinica.  At this time, Plaintiff had private health insurance.

79.    The staff at Clinica informed Plaintiff that she had a high risk pregnancy and, as such, her insurance would not cover her medical costs and recommended that she again enroll in an emergency Medicaid program.

80.     The staff again informed Plaintiff that she would only be able to give birth at Atlanta Medical Center or North Fulton Medical Center under the terms of the program and that, if she went elsewhere, she would not be covered.  She was also informed that, if she decided not to give birth at Atlanta Medical Center or North Fulton Medical Center, Clinica would discontinue her prenatal treatment. Plaintiff also received a Clinica identification card that listed the physician assigned to Plaintiff (Dr. Wendell Hackney) and that Plaintiff was required to give birth at Atlanta Medical Center.  At her first meeting with Dr. Hackney, he told her that she would have to give birth at the Atlanta Medical Center.  This statement was made in his capacity as an agent for Tenet.  At subsequent appointments with Dr. Hackney he reconfirmed that Plaintiff was still planning to give birth at the required facility.  These statements also were made in Dr. Hackney's capacity as an employee or authorized representative for Tenet.  Plaintiff cannot now recall the dates of these appointments but they can be easily obtained from Tenet's records and/or those of Dr. Hackney.

81.     During the term of this pregnancy, Plaintiff had to seek emergency care six times for potential miscarriages and was forced to go to Atlanta Medical Center for fear of not receiving insurance coverage.  Plaintiff strongly preferred to go to a hospital closer to her home but was unable to do so because she had been

informed that any such care would not be covered. Each time she travelled to Atlanta Medical Center, she presented her Clinica card, and the Tenet doctors and staff informed her that she would need to continue to travel to Atlanta Medical Center for all treatments and the birth. Each time she met with Dr. Hackney, he informed her that she must return to Atlanta Medical if further complications arose. Before checking out of the hospital she was reminded as part of the hospital's exit procedure that she must return to Atlanta Medical for the birth or if complications arose. Plaintiff does not remember the names of the staff members who made these statements, but they are readily available from Tenet's records.

82.     When the birth of her twins arrived, Plaintiff once again presented her Clinica card at Atlanta Medical Center and gave birth there. Plaintiff strongly preferred to go to a hospital closer to her home but was unable to do so because she had been informed by Clinica and Tenet staff that any such care would not be covered. Once again, in addition to the inconvenience to her and family and friends of traveling many miles further for her emergency care and birth, Plaintiff suffered a variety of higher costs as a result of Tenet's assigning her to Atlanta Medical Center. Plaintiff also paid money, such as co-pays, to Tenet and was later sent further invoices and bills from Tenet.

83.    Once again, Plaintiff took the bills to Clinica as she had been instructed.

84.    After a follow-up visit in or about early 2010, Plaintiff's only dealings with Tenet were about bills and reimbursements.   In or about 2010, Plaintiff discovered that her private insurance would have covered all of her prenatal care, her emergency treatments, and the birth.

85.    Plaintiff requested to be refunded all amounts that had been paid to Clinica and Tenet during the times she was insured, basically for the entire second pregnancy.  Plaintiff was denied any refunds whatsoever.

86.    In 2009, Tenet, through Atlanta Medical Center, paid approximately $502,553 to Clinica for the benefit of Atlanta Medical Center so the owners and operators of Clinica would continue to direct Clinica patients to deliver at Atlanta Medical Center.  *See* Non-Prosecution Agreement, ¶ 99.  At no time did Tenet or any of its employees or agents inform her that she was not required to give birth at Atlanta Medical Center as her Clinica identification card stated, despite its knowledge that Plaintiff had been falsely informed she was required to deliver at Atlanta Medical Center.

87.    In 2010, Tenet, through Atlanta Medical, paid approximately $495,215 to Clinica for the benefit of Atlanta Medical Center so the owners and

operators of Clinica would continue to direct Clinica patients to deliver at Atlanta Medical.  *See* Non-Prosecution Agreement, ¶ 101.

88.    Each time Plaintiff visited Atlanta Medical Center, she was asked to sign one or more documents that she did not understand.  Little or no effort was made by Tenet to explain the documents to Plaintiff.  She was simply informed that she had to sign the documents or she could not receive care at the hospital.

89.    Tenet now claims that a contract was formed between Plaintiff and Tenet.  *See* Motion to Dismiss, p. 15 (Tenet asserting "her allegations regarding the billing for and receiving of payment for services suggest the existence of an agreement").  Plaintiff agrees that contracts were likely formed between Plaintiff and Tenet each time Plaintiff sought services at Atlanta Medical.

90.    The terms of Plaintiff's contracts with Tenet included at least the following: (1) payment by Plaintiff, or by others on Plaintiff's behalf, of the amount due for medical services to Tenet; (2) provision by Tenet of medical and support services in a legal and proper manner; and (3) as a matter of Georgia law, the requirement that both parties deal fairly and in good faith.  Additional terms of Plaintiff's contracts with Tenet will be clarified in discovery.  As set out below, Plaintiff met all of her obligations under the contracts, but Tenet breached the terms of the contracts repeatedly.  Tenet also violated the covenant of good faith

and fair dealing by, among other deficiencies, acting in the illegal fashion described herein.

91.    As a result of the foregoing, Plaintiff S.B. has suffered damages.

## CLASS ACTION ALLEGATIONS

92.    Plaintiff Silvia Barete brings this class action on behalf of herself and the following class of persons:

> All persons who were patients at Clinica and were referred to Tenet hospitals for labor and delivery services.

93.    Plaintiff reserves the right to modify or amend the definition of the proposed Class, or add other proposed classes or subclasses, before the Court determines whether certification is appropriate and as the Court may otherwise allow.

94.    Excluded from the Class are Defendant's officers, directors, affiliates, legal representatives, employees, successors, subsidiaries, and assigns.   Also excluded from the Class are any judges, justices, or judicial officers presiding over this matter and the members of their immediate families and judicial staff.

95.    The time period for the Class is the number of years immediately preceding the date on which this Complaint was filed as allowed by the applicable statute of limitations, and further extended back in time based on Defendant's

fraudulent conduct which precluded knowledge by Plaintiff and the Class of Tenet's illegal practices and, pursuant to O.C.G.A. § 9-3-99, which tolled the limitation period for Plaintiff and the Class to bring their claims.

96.    <u>Numerosity</u>: The members of the proposed Class are so numerous that individual joinder of all members is impracticable.  Upon information and belief, there are thousands, if not tens of thousands, members of the proposed class. The exact number and identities of the members of the proposed Class are unknown at this time and can be ascertained only through appropriate discovery.

97.    <u>Common Questions of Law and Fact Predominate</u>: There are many questions of law and fact common to Plaintiff and the Class, and those questions substantially predominate over any questions that may affect individual Class members.  These common questions include, but are not limited to, the following:

    i.    Whether Tenet engaged in the fraudulent conduct alleged herein;

    ii.    Whether Tenet entered into the above-described contracts with Clinica;

    iii.    Whether Plaintiff and the members of the Class suffered damages as a result of the contracts entered into between Tenet and Clinica;

iv.    Whether Tenet had a duty to disclose that Plaintiff and members of the Class were not obligated to give birth at Tenet's hospitals to receive emergency Medicaid services;

v.    Whether Tenet established a contract with each Class member who obtained services at a Tenet hospital;

vi.    Whether Tenet breached its contracts directly or via the covenant of good faith and fair dealing; and

vii.    Whether Tenet's contracts are valid and enforceable or whether unjust enrichment applies.

98.    <u>Typicality</u>: Plaintiff's claims are typical of the claims of other members of the Class in that they arise out of the same or substantially similar wrongful practices of Defendant.  Plaintiff has suffered the harm alleged and has no interests antagonistic to the interests of any other member of the Class.

99.    <u>Adequacy of Representation</u>: Plaintiff will fairly and adequately represent and protect the interests of the Class.  Plaintiff has retained counsel with substantial experience in prosecuting complex and consumer class action litigation. Plaintiff and her counsel are committed to vigorously prosecuting this action on behalf of the Class, and have the financial resources to do so.

100.   <u>Superiority of Class Action</u>: Plaintiff and the members of the Class suffered, and will continue to suffer, harm as a result of Defendant's wrongful conduct.  A class action is superior to other available methods for the fair and efficient adjudication of the present controversy.  Individual joinder of all members of the Class is impractical.  Even if individual Class members had the resources to pursue individual litigation, it would be unduly burdensome to the courts in which the individual litigation would proceed.  Individual litigation magnifies the delay and expense to all parties in the court system of resolving the controversies engendered by Defendant's common course of conduct.  The class action device allows a single court to provide the benefits of unitary adjudication, judicial economy, and the fair and equitable handling of all Class members' claims in a single forum.  The conduct of this action as a class action conserves the resources of the parties and of the judicial system, and protects the rights of the Class members.

101.   <u>Risk of Inconsistent or Varying Adjudication</u>: Class action treatment is proper, and this action should be maintained as a class action because the risks of separate actions by individual members of the Class would create a risk of: (a) inconsistent or varying adjudications with respect to individual Class members which would establish incompatible standards of conduct for the Defendant as the

parties opposing the Class; and/or (b) adjudications with respect to individual Class members would, as a practical matter, be dispositive of the interests of other Class members not party to the adjudication or would substantially impair or impede their ability to protect their interests.

102.   <u>Action Generally Applicable to Class as a Whole</u>: Defendant, as the party opposing the Class, has acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the Class as a whole.

<b><u>REQUESTS FOR RELIEF</u></b>

<b><u>COUNT ONE</u></b>

<b><u>FRAUD</u></b>

103.   Plaintiff incorporates by reference Paragraphs 1 through 102 above as if set forth verbatim herein.

104.   Tenet conducted a fraudulent scheme to ensure that Plaintiff and members of the Class would deliver their children, and receive other medical services, at Tenet hospitals.  Tenet willfully and knowingly made, or caused to be made, affirmative misrepresentations of material facts in the furtherance of this scheme including that Plaintiff and the Class were required to deliver at one of Tenet's hospitals.

105.   It also willfully and knowingly concealed material facts from Plaintiff and the Class including that the costs associated with their childbirth and the care of their newborn baby would be covered even if Plaintiff and the Class delivered elsewhere than at one of Tenet's hospitals.

106.   As a result of these false and misleading statements of fact and representations, Plaintiff and the Class traveled long distances from their homes to deliver at Tenet hospitals, placing their health and safety, and that of their newborn babies, at risk.  They did not receive the appropriate, medically necessary, or most beneficial care for their situation, but rather were steered by Defendant and its scheme to non-optimized providers and outcomes.  Each victim was also forced to pay additional funds as a result of Tenet's scheme, amounts they would not have had to pay if they had received care at the appropriate hospital.

107.   Tenet knew of the falsity of the factual misrepresentations at the time these misrepresentations were made.  Tenet also knew the material nature of the facts that it willfully concealed from Plaintiff and the Class, and that Tenet ought to have disclosed these facts at that time to the Plaintiff and the Class.  Tenet had superior knowledge not available to Plaintiff and the Class; as such, Tenet had the duty to disclose the facts.

108.   Plaintiff and the Class relied upon Tenet's factual representations, and were unaware of the falsity or misleading nature of the factual representations. Their reliance was reasonable and unavoidable under the circumstances.   As a result of such reliance, Plaintiff and the Class sustained damages.

109.   By engaging in the conduct described above, Tenet committed a fraud upon Plaintiff and the Class.   Moreover, Tenet's wanton conduct was systematic, in reckless disregard of statutory and other duties, tantamount to criminal indifference to civil obligations, and unconscionable.

110.   Tenet is therefore liable to Plaintiff and the Class for compensatory and punitive damages in such amount as may be proven at trial, together with attorneys' fees and expenses and such other amounts as may be appropriate.

111.   The damages of Plaintiff and the Class members will include at least the following: all extra expenses paid by them as a result of Defendant's scheme, including for transportation, lodging, meals, and expenses for them and their families; all amounts paid to Tenet by Plaintiff and the Class members, including for medical and non-medical goods and services; all amounts still owing to Tenet from any Class member according to Tenet's records; and all amounts paid to Clinica and other providers for services that should have been included, and were generally included, by Tenet in its pregnancy, birth, and post-partem programs.

## COUNT TWO

## NEGLIGENT MISREPRESENTATION

112.   Plaintiff incorporates by reference Paragraphs 1 through 102 above as if set forth verbatim herein.

113.   Tenet conducted a fraudulent scheme to entrap Plaintiff and the Class into delivering their babies, and receiving other medical services, at Tenet's hospitals, irrespective of the well-being of Plaintiff and the Class.  Tenet made, or caused to be made, affirmative misrepresentations of material facts in furtherance of this scheme.  It also concealed material facts from Plaintiff and the Class.

114.    Tenet knew the falsity of the misrepresentations.  Tenet had superior knowledge not available to Plaintiff and the Class; as such, it had the duty to disclose the facts.

115.   Plaintiff and the Class relied upon Tenet's representations, and were unaware of the falsity or misleading nature of the representations.  Their reliance was reasonable and unavoidable under the circumstances.  As a result of such reliance, Plaintiff and the Class sustained damages.

116.   By engaging in the conduct described above, Tenet committed the tort of negligent misrepresentation upon Plaintiff and the Class.

117.     Tenet is therefore liable to pay Plaintiff and the Class damages for all losses, including, but not limited to, the following: all extra expenses paid by them as a result of Defendant's scheme, including for transportation, lodging, meals, and expenses for them and their families; all amounts paid to Tenet by Plaintiff and the Class members, including for medical and non-medical goods and services; all amounts still owing to Tenet from any Class member according to Tenet's records; and all amounts paid to Clinica and other providers for services that should have been included, and were generally included, by Tenet in its pregnancy, birth, and post-partem programs.

118.   These amounts should be paid along with exemplary and/or punitive damages in such amount as may be proven at trial, together with attorneys' fees and expenses and such other amounts as may be appropriate.

## COUNT THREE

## MONEY HAD AND RECEIVED

119.     Plaintiff incorporates by reference Paragraphs 1 through 102 above as if set forth verbatim herein.

120.   By the acts described in Paragraphs 1 through 93, Tenet unlawfully billed and collected money to which it was not entitled.  It demanded and accepted money from Plaintiff that it knew it was not legally permitted to request or accept.

In these ways, Tenet received money belonging to Plaintiff and the Class.  In or about 2010, well before Plaintiff could possibly have known of Tenet's massive fraud, she did request a refund of the amounts she had paid to Clinica and Tenet.

121.   Tenet refused to repay the amounts it had illegally and improperly collected from Plaintiff.

122.   Tenet has benefited from the receipt of money and, under principles of equity and good conscience, it should not be permitted to keep said money.

123.   Tenet must not be permitted to take advantage of its own wrongs by retaining such funds.

124.   Moreover, Tenet is liable to pay Plaintiff and the Class compensatory and punitive damages in such amount as may be proven at trial, together with attorneys' fees and expenses and such other amounts as may be appropriate.

## COUNT FOUR

## UNJUST ENRICHMENT

125.   Plaintiff incorporates by reference Paragraphs 1 through 102 above as if set forth verbatim herein.

126.   This Count Four is brought in the alternative to Counts Five and Six below.  Plaintiff acknowledges that it cannot pursue any claim under both breach of contract and unjust enrichment.  If Tenet's contracts are determined to be

invalid or unenforceable as to any claim, however, unjust enrichment should dictate that the funds improperly received by Tenet be disgorged.

127.   Through the conduct described in Paragraphs 1 through 93, Tenet benefited at the expense of Plaintiff and the Class.  Equity and good conscience require that Tenet be ordered to repay these sums to Plaintiff and the Class in restitution.

128.   Tenet must not be permitted to take advantage of its own wrongs by retaining such funds.

129.   Moreover, Tenet is liable to pay Plaintiff and the Class compensatory and punitive damages in such amount as may be proven at trial, together with attorneys' fees and expenses and such other amounts as may be appropriate.

## COUNT FIVE

## BREACH OF CONTRACT

130.   Plaintiff incorporates by reference Paragraphs 1 through 102 above as if set forth verbatim herein.

131.   As admitted by Tenet, each time Plaintiff dealt with Tenet, a contract was likely formed.  This Count Five is brought in the alternative to Count Four, and Plaintiff does not seek double recovery.  In other words, if either Count for breach of contract is successful as to any claim, Plaintiff understands that she

36

cannot also pursue that claim through unjust enrichment.  To any extent, however, the contracts are inapplicable to any claim, or invalid or unenforceable for any reason, unjust enrichment would apply and require disgorgement of Tenet's improper gains.

132.   Plaintiff (like most Class members) does not speak fluent English, and was even less fluent at the time in question.  She was not able to read or understand the documents that Tenet required her to sign.  Plaintiff was not allowed to retain the written form documents of Tenet which she was forced to sign.  As such, discovery will be needed to understand all of the terms of the parties' contractual agreements.

133.   Plaintiff and the Class did, however, meet all of their obligations under the contracts, including payment of the amounts due and owing for the medical and support services provided by Tenet.

134.   Tenet, on the other hand, breached all such contracts by its conduct as alleged herein.

135.   Tenet's breaches caused Plaintiff and the Class damage and they are entitled to be made whole.

## COUNT SIX

## BREACH OF CONTRACT – GOOD FAITH AND FAIR DEALING

136.   Plaintiff incorporates by reference Paragraphs 1 through 102 above as if set forth verbatim herein.

137.   As admitted by Tenet, each time Plaintiff dealt with Tenet, a contract was likely formed.  This Count Six is brought in the alternative to Count Four, and Plaintiff does not seek double recovery.  In other words, if either Count for breach of contract is successful as to any claim, Plaintiff understands that she cannot also pursue that claim through unjust enrichment.   To any extent, however, the contracts are inapplicable to any claim, or invalid or unenforceable for any reason, unjust enrichment would apply and require disgorgement of Tenet's improper gains.

138.   Georgia law imposes upon each party to a contract the duty of good faith and fair dealing.  Good faith and fair dealing, in connection with executing contracts and discharging performance and other duties according to their terms, means preserving the spirit – not merely the letter – of the bargain.  Put differently, the parties to a contract are mutually obligated to comply with the substance of their contract in addition to its form.   Evading the spirit of the bargain and

performing in a fraudulent or illegal fashion constitute examples of bad faith in the performance of contracts.

139.   Subterfuge and evasion violate the obligation of good faith in performance even when an actor believes his conduct to be justified.   A lack of good faith may be overt or may consist of inaction, and fair dealing may require more than honesty.   Examples of violations of good faith and fair dealing are evasion of the spirit of the bargain, willful rendering of imperfect performance, abuse of a power to specify terms, and participation in illegal conduct.

140.   Tenet has breached the covenant of good faith and fair dealing with Plaintiff and the other Class members through the practices as alleged herein.

141.   Plaintiff and the other Class members have performed all, or substantially all, of the obligations imposed on them under their contracts with Tenet, or those obligations were waived.

142.   Plaintiff and the other Class members sustained damages as a result of Defendant's breaches of the contracts as modified by the covenant of good faith and fair dealing.

143.   Tenet's breaches of the contracts via its lack of good faith and fair dealing caused Plaintiff and the Class damage and they are entitled to be made whole.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, on behalf of herself and the proposed Class, requests that this Court:

1.      Certify this case as a class action pursuant to O.C.G.A. § 9-11-23;

2.      Find for Plaintiff and the Class as to each count of this Class Action Complaint;

3.      Award Plaintiff and the Class actual, incidental, and consequential damages in an amount to be proven at trial, including any and all compensatory damages, punitive damages, restitution, and any applicable penalties and interest;

4.      Award all reasonable costs incurred by Plaintiff in connection with this action, including reasonable attorneys' fees pursuant to applicable law;

5.      Grant a trial by jury; and

6.      Award such other relief as this Court deems just and proper.

DATED this 26th day of January, 2017.

Respectfully submitted,

BY:   WEBB, KLASE & LEMOND, LLC

*/s/ E. Adam Webb*
E. Adam Webb
  Georgia State Bar No. 743910
G. Franklin Lemond, Jr.
  Georgia State Bar No. 141315
1900 The Exchange, S.E.
Suite 480
Atlanta, Georgia 30339
(770) 444-0773
Adam@WebbLLC.com
Franklin@WebbLLC.com

Richard D. McCune*
**McCUNE WRIGHT AREVALO, LLP**
3281 East Guasti Road
Suite 100
Ontario, CA 91761
(909) 557-1250
rdm@mccunewright.com

Joseph G. Sauder*
**McCuneWright LLP**
555 Lancaster Avenue
Berwyn, Pennsylvania 19312
(610) 200-0580
jsg@mccunewright.com

* Pro Hac Vice Application Forthcoming

41

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 26th day of January, 2017, I caused the foregoing document to be electronically filed with the Clerk of Court using the CM/ECF system which automatically sends email notification of such filing to all attorneys of record.

<u>/s/  G.  Franklin Lemond, Jr.</u>
G. Franklin Lemond, Jr.